CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 1 6 2008

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| RAY F. REYNOLDS,     ) | |
|      ) | |
|     Plaintiff,     ) | Civil Action No. 5:07CV00018 |
|      ) | |
| v.     ) | |
|      ) | **MEMORANDUM OPINION** |
| CROWN EQUIPMENT CORP.     ) | |
|      ) | |
| and     ) | By:     Glen E. Conrad |
|      ) | United States District Judge |
| ALLIANCE MATERIAL HANDLING, INC.,     ) | |
|      ) | |
|     Defendants.     ) | |

This products liability case arose out of an incident at the plaintiff's workplace during which the cab of the forklift truck in which he was riding free fell to the ground. The matter is before the court on the motions to dismiss and to exclude the testimony of plaintiff's experts filed by defendant Crown Equipment Corp. ("Crown") and the motions for summary judgment and to exclude the testimony of plaintiff's experts filed by defendant Alliance Material Handling, Inc. ("Alliance"). For the reasons set forth below, Alliance's motion for summary judgment will be granted, and its motion to exclude the testimony of plaintiff's experts will be denied as moot. Furthermore, Crown's motion to dismiss will be granted in part and denied in part, and its motion to exclude the testimony of plaintiff's experts will be granted in part and denied in part.

## BACKGROUND

The plaintiff, Ray F. Reynolds ("Reynolds" or "plaintiff"), is a resident of Warren County, Virginia and was employed by H.P. Hood, LLC ("Hood") at the time of the accident that is the subject of this diversity action. Crown is an Ohio corporation in the business of designing,

manufacturing, and selling industrial equipment including "very narrow aisle" forklift trucks ("VNAs"). Alliance is a Maryland corporation engaged in the business of repairing, servicing, and maintaining equipment, including VNAs manufactured by Crown.

In 2000, Hood purchased four VNAs from Crown and contracted with Alliance for the repair and maintenance of the trucks. Alliance had two service technicians on location at the Hood warehouse who worked Monday through Friday and were on call on the weekends and on holidays. The Hood facility operates twenty-four hours a day, seven days a week. Alliance also provided a one-time operator and train-the-trainer training session during the summer of 2000. Reynolds began his employment with Hood in 2002, therefore he did not participate in the Alliance training session. Instead, he was trained on the operation of the VNA by other Hood employees.

On the morning of March 7, 2005, at approximately 7:00 a.m., Reynolds was operating VNA # 4, one of the Crown VNAs located at the Hood warehouse in Winchester, Virginia. The VNA has an enclosed operator's cab which is attached to a mast permitting movement up and down the aisles of the warehouse. Attached to the cab is a turret head with forks that can be used to move pallets on and off the vertical shelving of the warehouse. While Reynolds was in the cab approximately 40 feet off the ground, the VNA indicated that an error had occurred in its operation by displaying a "wrench" condition. The VNA would no longer respond to Reynolds' commands. In an effort to rectify the situation, Reynolds attempted to turn the VNA off and on several times. When he was unsuccessful in clearing the "wrench" condition, Reynolds radioed for assistance.

2

Randy Dove ("Dove"), another Hood employee, responded to Reynolds' call and came over to VNA # 4. Dove then opened the manual lowering valve on the back of the VNA, after which VNA # 4 descended normally until it was approximately 15 to 20 feet off the ground. At that point, both Reynolds and Dove heard a loud bang, and the cab of the VNA, with Reynolds inside, broke free from the mast and fell quickly to the floor. As a result of the fall, Reynolds sustained a burst fracture to his L-1 vertebrae and a damaged spinal cord.

After the accident, Hood, Crown, and Alliance all participated in the investigation of the incident and VNA # 4. Hood and Crown representatives ultimately determined that the accident was caused by the failure of one of the four cab roller bearings. This failure caused the cab and the mast to become attached. When the descent of the mast impacted with the damaged cab roller bearing, the cab broke free from the mast. Because the cab was being lowered using the manual lowering valve, the chains holding the cab had become slack, and the cab was no longer supported when it broke away from the mast, causing it to fall. There is some evidence to indicate that Hood employees reported unusual noises coming from VNA # 4 to the Alliance technician on site, Brian Rudy, prior to this accident. However, Alliance and Rudy now dispute that any such reports were made.

Alliance personnel disassembled VNA # 4 at the Hood warehouse while Hood employees observed. Crown personnel came to inspect the VNA later in March 2005. The disassembled VNA, including the damaged cab roller bearing, was stored at the Hood facility in Alliance's work area until the plaintiff requested the bearing in connection with this litigation. A Hood employee went to this area of the warehouse in December of 2006 and obtained a broken bearing that was sent to plaintiff's experts for examination. However, it later became apparent that this

3

bearing was not the cab roller bearing originally taken from VNA #4. It now appears that the relevant cab roller bearing is no longer present in the Hood warehouse, and its whereabouts are unknown.

Reynolds has filed a complaint against both Crown and Alliance asserting claims against Crown for negligence and breach of the implied warranty of merchantability and against Alliance for negligence. Specifically, the plaintiff contends that Crown was negligent in that it: (1) designed the VNA so that it was defective and unreasonably dangerous by providing a manual lowering valve that bypassed the equipment's safety device; (2) designed the manual lowering valve in such a way that the operator of that valve could not observe slack in the chain and cables used to raise and lower the VNA cab; (3) manufactured the VNA so that it malfunctioned and the cab dropped without warning; (4) failed to provide appropriate warnings on the VNA, including warnings about hazards associated with manually lowering the cab with an operator still inside; and (5) failed to provide instructions as to how to safely remove an operator from the cab in the event of a malfunction. The plaintiff contends that Alliance was negligent in that it: (1) breached its duty to exercise reasonable care in the service, maintenance, and repair of the VNA by failing to repair or service VNA #4 after being informed that the unit was making unusual noises and emitting smoke; and (2) failed to provide proper training as to how to safely remove an operator from the cab in the event of a malfunction.

Crown has now filed a motion to dismiss based on spoliation of evidence as well as a motion in limine to exclude the testimony of the plaintiff's experts. Alliance has filed a motion for summary judgment and a motion to exclude the testimony of the plaintiff's experts. The

4

plaintiff has filed responses to all of these motions, and the parties appeared before the court for a hearing on May 29, 2008. The motions are now ripe for review.

## DISCUSSION

**I.     Crown's Motion to Dismiss and Alliance's Motion for Summary Judgment**

Crown has filed its motion to dismiss based solely upon the plaintiff's alleged spoliation of evidence, namely the loss of the cab roller bearing that was the cause of the accident.[1] Alliance has filed its motion for summary judgment also based, in part, upon the alleged spoliation of evidence. In addition, Alliance claims that there is no legal or factual basis for the plaintiff's claim of inadequate training.

**A.     Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985). When a motion for summary judgment is supported by affidavits or other evidence as provided for in Rule 56, the opposing party may not rest upon the

---

[1] Although Crown styles its motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it relies upon numerous exhibits in support of its motion, including transcripts of deposition testimony, which are not attached to the plaintiff's complaint or incorporated therein by reference. Therefore, the court will treat the motion as one for summary judgment under Federal Rule of Civil Procedure 56. See Bosiger v. U.S. Airways, 510 F.3d 442, 450 (4th Cir. 2007).

allegations in the pleadings and must, instead, present evidence showing that there is a genuine

issue for trial. If the adverse party fails to present such evidence, summary judgment, if

appropriate, should be entered. Fed. R. Civ. P. 56(e); Atkinson v. Bass, 579 F.2d 865, 866 (4th

Cir.), cert. denied, 439 U.S. 1003 (1978).

**B.      Spoliation of Evidence**

All of the parties agree that the broken cab roller bearing that was the cause of the

accident is no longer available, although the parties disagree with regard to the party responsible

for the loss of the bearing. Crown and Alliance contend that the spoliation of this key piece of

evidence has prejudiced their ability to defend themselves in this case to such an extent that

dismissal of the case is the appropriate remedy.

Although this case was brought under the court's diversity jurisdiction and generally

requires the application of Virginia law, the federal law of spoliation applies to this particular

issue because "the power to sanction for spoliation derives from the inherent power of the court,

not substantive law." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001).

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve

property for another's use as evidence in pending or reasonably foreseeable litigation." Id.

Although the court's power to address issues of spoliation arises from the need to preserve the

integrity of the judicial process, this power is "limited to that necessary to redress conduct 'which

abuses the judicial process.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46

(1991)). In Silvestri, the Court set forth the appropriate sanctions for a court to consider in a case

of spoliation as follows:

6

> While a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine. *In addition, a court must find some degree of fault to impose sanctions.* We have recognized that when imposing spoliation sanctions, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct. But dismissal should be avoided if a lesser sanction will perform the necessary function.

Id. (internal citations omitted) (emphasis added).

The plaintiff in Silvestri was injured while driving intoxicated when he lost control of his vehicle on a curve, crashed through a fence, and struck a utility pole. Id. at 586. The plaintiff claimed that he would not have sustained his disfiguring facial injuries if the vehicle's airbag had properly deployed during the crash. Id. Although the plaintiff retained an attorney in connection with possible legal action against General Motors, the manufacturer of the car, and had two accident reconstruction experts examine the vehicle, he failed to inform General Motors of these inspections, and General Motors did not actually learn anything about these events until the plaintiff filed suit almost three years later. Id. at 586-87. At that time, however, the car, which had been owned by the plaintiff's landlady, had been repaired and resold. Id. at 587. General Motors examined the car, but was unable to perform a crush analysis on the vehicle, which was crucial to a detailed reconstruction of the accident. Id. at 588.

The Court first found that the plaintiff did have a duty to preserve evidence both during litigation as well as during the "period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Id. at 591. The Court held that if a party is unable to fulfill this duty to preserve evidence, he nevertheless has an "obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence

7

if the party anticipates litigation involving that evidence." Id. The Court then found that, because Silvestri failed to take steps to either ensure that General Motors would have access to the vehicle or to provide it with timely notice of his claim, Silvestri had breached his duty not to spoliate evidence. Id. at 592. This was true even though Silvestri was not the actual owner of the car.

The Court then noted that, while dismissal is a severe sanction, it may be appropriate if a court determinates that either (1) the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim. Id. at 593. The Court went on to find that Silvestri's conduct was at least negligent, and possibly deliberate, and that General Motors had been highly prejudiced in that it was denied access "to the only evidence from which it could develop its defenses adequately." Id. at 594. The Court noted that the only other possible sanction, prohibiting the plaintiff's accident reconstruction experts from testifying altogether, would result in the plaintiff's having no case at all. Id. at 595. Therefore, under the circumstances, dismissal was appropriate. Id.

In King v. American Power Conversion Corp., 181 Fed. Appx. 373 (4th Cir. 2006) (unpublished), the Court again upheld dismissal as an appropriate remedy for spoliation of evidence. The Kings owned a store which was damaged by a fire believed to have originated in a UPS unit manufactured by the defendant. 181 Fed. Appx. at 374-75. The Kings' insurance carrier hired two consultants to examine the cause of the fire. Id. at 375. One of the consultants took custody of the UPS and concluded that the cause of the fire was likely the UPS, but further testing of the unit would be necessary. Id. The consultant packed the UPS for storage in his

8

office until he received further instruction.  Id.  The attorney hired by the plaintiffs informed the consultant that he would be happy to take possession of the device and asked to be informed of any further inspections of the UPS.  Id.  Some time later, the consultant received permission from the Kings' insurer to destroy the UPS and did so without notifying the plaintiffs or their counsel. Id. at 375-76.  The Kings then filed suit against the defendant alleging that the UPS was defective and had caused the fire at their store.  Id. at 376.

The Court again recognized that dismissal is an extreme sanction for spoliation of evidence, but nevertheless found that bad faith conduct on the part of the plaintiff would not be necessary "if the spoliation of evidence effectively renders the defendant unable to defend its case."  Id.  The Court went on to find that, even though the evidence had been in the hands of a third party, the Kings failed to discharge their duty to provide notice to the defendant given that they made no effort to contact the defendant or to otherwise verify that it was aware of their claims or of the existence of the UPS.  Id. at 377.  The Court also rejected the Kings' claim that the defendant was not prejudiced because they had their own expert reports and photographs of the UPS for the defendant's experts to review.  Id. at 378.  Instead, the Court held that the actual UPS was central to the plaintiffs' claims and that it was not reasonable to expect the defendant to simply rely upon reports of the plaintiffs' experts.  Id.  The Court finally noted that an adverse inference instruction to the jury would not "adequately level the playing field under the circumstances of this case."  Id.

The defendants argue that this situation is governed by Silvestri and King.  First, Crown and Alliance contend that Reynolds had a duty to preserve the evidence, *i.e.*, the cab roller bearing, even though he may not have owned or otherwise controlled it.  Furthermore, the

9

defendants both argue that the spoliation of evidence should be imputed to the plaintiff even if it is directly attributable to a third party, such as Hood. Crown and Alliance admit that they do not know what party is actually responsible for the loss of the cab roller bearing. Nevertheless, the bearing was stored at Hood's facility along with the other components of the VNA. The defendants also note that the experts retained by the plaintiff in this case have received some compensation from Hood, the plaintiff shares counsel with Hood, and Hood may have a workers' compensation lien on any potential recovery by Reynolds. Therefore, Crown and Alliance contend that the loss of the bearing should be ascribed to Hood and, therefore, imputed to Reynolds. In support of this proposition, the defendants cite Wolfe v. Virginia Birth-Related Neurological Injury Compensation Program, 40 Va. App. 565 (2003). In Wolfe, the Court held that a participating physician is in privity with the Virginia Birth-Related Neurological Injury Compensation Program by operation of statute and the payment of assessments by the physician to the Program. 40 Va. App. at 584. Therefore, the Court found that the spoliation of evidence by a physician could be imputed to the Program. Id. at 585.

Both Crown and Alliance also argue that the loss of the cab roller bearing has substantially prejudiced their respective defenses. Crown points to the following deposition testimony of the plaintiff's expert, John Orlowski:

Q.      And it's your fundamental opinion, is it not, sir, that this bearing that
        you've inspected and were provided prematurely failed and caused this
        accident?

A.      Yes.

Q.      You would agree that it's critical to allow experts the opportunity to
        inspect and evaluate the bearing in question, do you not, sir?

10

A.    Sure.

Q.    Having the opportunity to inspect the bearing and actually see the bearing
      in question is significant to the scientific process, is it not, sir?

A.    Sure.

Q.    And if the defendants, specifically Alliance Material and Crown
      Equipment weren't given the opportunity to inspect the bearing that
      caused this accident, you would agree that would be highly prejudicial to
      the defendants?

A.    Yes.[2]

See Deposition Testimony of John Orlowski at 194-95. Later during Orlowski's deposition, after

counsel for the defendants showed him certain photographs taken of the bearing at the time VNA

# 4 was disassembled, he was compelled to agree for the first time that the bearing sent to him

during his inspection was not actually the cab roller bearing at issue in this case. Id. at 206-07.

Crown now contends that its inability to study or inspect the bearing prevents it from mounting a

meaningful defense to the plaintiff's claims and that this contention is underscored by the

testimony of the plaintiff's own expert with regard to the importance of inspecting the actual

bearing at issue in this case.

      Alliance likewise claims that it must examine the missing cab roller bearing in order to

establish precisely why the bearing failed and to determine whether this failure can be linked to

some action or inaction on the part of Alliance or to some other cause. In addition to Mr.

---

[2] The plaintiff states in his response that Mr. Orlowski, after finally reviewing the transcript of his
deposition testimony, intends to submit an errata sheet indicating his response should be "No" to the last question
rather than "Yes." To date, however, such an errata sheet has not been received by either the defendants or the court.
The court finds it somewhat disingenuous for the plaintiff to assert for the first time in response to the defendants'
motions that Mr. Orlowski desires to change such an unambiguous response. In any case, however, this response
improperly draws a legal conclusion with regard to the potential prejudice to the defendants in the absence of the
opportunity to inspect the bearing. Therefore, the court will disregard this question and response in its determination
of the spoliation issue.

Orlowski's testimony as set forth above, Alliance notes that the plaintiff's other expert, Frederick Heath, also testified that a root cause analysis of the bearing would be the appropriate method to use to investigate the cause of the accident. See Deposition of Frederick Heath at 173. Therefore, Alliance claims that it has suffered undue prejudice based upon its inability to perform any analysis of the subject cab roller bearing.

In response, Reynolds contends that he was not responsible for the loss of the cab roller bearing. Reynolds asserts that there is no evidence to indicate that he had any involvement with the loss of the bearing, that it was never under his control, and that he is not in privity with Hood with regard to the spoliation arguments made by the defendants. Reynolds notes that the defendants have not submitted any evidence that Hood has made an appearance in this matter or that Hood is seeking subrogation for any amounts paid to him in workers' compensation benefits. Reynolds also contends that Wolfe, supra, does not apply in this situation because there is no statutory relationship between himself and his employer, unlike that existing between the physician and the Program in Wolfe. Reynolds also argues that this case is distinguishable from King and Silvestri because it is unclear who is responsible for the spoliation of evidence. In fact, according to the plaintiff, Alliance itself may have been responsible for the loss of the bearing.

Furthermore, the plaintiff notes that both Crown and Alliance had notice of the accident shortly after it took place and that both defendants took the opportunity to inspect the relevant physical evidence during the investigation into the accident. Barry Boyer, a service product manager for Crown, testified at his deposition that when he viewed VNA # 4 a week after the accident, he examined the damaged column roller and photographed it at the Hood warehouse. See Deposition of Barry Boyer at 16-18. Mr. Boyer further testified that representatives from

12

Alliance were also present at the time and that he had noted that the bearing had taken "one heck of an impact." Id. at 18. Mr. Boyer stated that there was no further testing he wanted or needed to do on the bearing. Id. Charles Gulosh, a Hood employee, also submitted an affidavit in which he stated that an Alliance employee had removed the damaged bearing and had placed it in the Alliance work area of the Hood plant.

Reynolds also contends that neither Crown nor Alliance has been significantly prejudiced by any spoliation of evidence in this case. As previously stated, both defendants had notice of access to the evidence after the accident, and Alliance employees actually disassembled the VNA. Brian Rudy of Alliance testified that he had seen the bearing after the accident, and it looked like it had been used so much it had melted. See Deposition of Brian Rudy at 153. Reynolds also asserts that employees of Crown and Hood as well as his own experts and the defendants' experts have all concluded that the cab roller bearing was the cause of the accident. See Report of Michael Rogers, P.E. at 3 ("I have not personally inspected the damaged mast roller and bearing but based upon photographs and a description of their condition as well as accounts of problems experienced by others in the days leading up to the accident, it is apparent that this roller and bearing were failing for some significant period of time"); Report of Roger W. Link at 6 ("The cause of the cab to jam in the elevated position was due to a damaged roller/bearing for the cab of the forklift"). Neither Rogers nor Link, experts for the defendants, have examined the bearing at issue.

More importantly, the plaintiff maintains that many of his claims are not actually based upon the reason for the failure of the cab roller bearing. His negligent design and failure to warn claims against Crown are not dependent upon the initial accident, but upon the use of the manual

13

lowering valve for any reason and the lack of proper warnings with regard to that valve. With regard to his negligent maintenance claim against Alliance, Reynolds argues that his claims are based upon Alliance's failure to take VNA # 4 out of service after having been informed of problems with the unit, regardless of the reason or reasons for those problems. Alliance responds that the bearing is, in fact, directly relevant to the plaintiff's claim for negligent maintenance because the plaintiff must prove that Alliance had notice of the specific problem that existed before he can succeed on that claim.

Crown and Alliance both respond that Crown's Accident Report Form indicates that the damaged parts of the VNA were left in the custody of Chuck Gulosh of Hood, not with any Alliance or Crown employees. Crown also asserts that, even though its lay employees may have had the opportunity to inspect the bearing during their investigation of the accident, its experts have been deprived of that opportunity. Crown contends that such an examination is necessary to resolve issues of intervening cause and contributory negligence, such as Hood's failure to remove the VNA from service after it exhibited problems over the weekend prior to the accident or the VNA's possible involvement in a crash at the Hood facility which could have damaged the bearing.

After considering the parties' arguments, the court finds that the plaintiff cannot be held responsible for the spoliation of evidence in this case. First the court does not believe that Reynolds was in privity with his employer so as to impute any conduct of Hood to the plaintiff. The factors cited by the defendants, payment of experts and shared counsel, came about only after the accident and the investigation, and are not relevant to the plaintiff's relationship with his employer at the time of the accident. The court also finds that there is no evidence to indicate

that Reynolds took any purposeful action which resulted in the loss of the cab roller bearing at issue in this case. The plaintiff was not on site when VNA # 4 was disassembled by Alliance personnel and stored at the Hood warehouse in Winchester. In fact, the plaintiff believed that he had located the correct bearing which was sent to his expert for examination. Only later did the plaintiff, as well as the defendants, discover that the original bearing must have been lost. Therefore, the plaintiff has not committed any egregious conduct which would amount to a forfeiture of his claim under Silvestri, supra. 271 F.3d at 593.

Nor is there any evidence to indicate that the plaintiff acted negligently with regard to the loss of the cab roller bearing. Unlike the plaintiff in Silvestri, Reynolds did not perform any testing or inspections of which he failed to inform Crown or Alliance. More importantly, both Crown and Alliance received notice of the accident in which Reynolds was injured, and both defendants were also provided with immediate access to the instrumentality which was involved in the accident. In King, supra, the Court upheld the dismissal of the plaintiff's claims because they had failed to provide notice to the defendant of their claims or of access to the relevant evidence. 181 Fed. Appx. at 377. Here, there is no dispute that Alliance personnel disassembled VNA # 4 and had the opportunity to examine the bearing at issue shortly after the accident. There is also no dispute that Crown had the opportunity to examine the VNA within two weeks of the accident.

It is true that dismissal may be appropriate if the effect of the spoliator's conduct was so prejudicial as to substantially deny a defendant the ability to defend against the claim. Silvestri, 271 F.3d at 593. But a necessary prerequisite for this determination is that the court must first find "some degree of fault." Id. at 590. This fault may include either purposeful misconduct or

15

simply negligent conduct, such as the failure to secure evidence from a third party coupled with a failure to provide the appropriate notice to potential defendants as in King. Because the plaintiff is not guilty of any degree of fault in connection with the loss of the bearing, the court concludes that he may not be held responsible for the spoliation of the evidence at issue here.

**B.      Negligence Claims Against Crown and Alliance**

The fact remains, however, that a key piece of evidence is no longer available to either the parties or their experts. When evidence is no longer available for whatever reason, Virginia law requires that a plaintiff must present evidence tending to negate all reasonable alternative explanations of the accident. See Bolling v. Montgomery Ward & Co., Inc., 930 F. Supp. 234, 238 (W.D. Va. 1996) (holding that "[u]nder Virginia law, a plaintiff who cannot produce the item allegedly responsible for his injuries must present evidence tending to negate all reasonable alternative explanations of an accident"); Logan v. Montgomery Ward, 216 Va. 425, 428-29 (1975) (granting summary judgment where a stove involved in an explosion that injured plaintiff had been discarded prior to examination because the remaining evidence failed to eliminate the possibility that the blame for the explosion could attach to a party other than the defendant). See also, Wilder v. Toyota Motor Sales, Inc., 23 Fed. Appx. 155 (4th Cir. 2001) (holding that, where plaintiff failed to refute defendant's alternative explanation for a product defect, the plaintiff's circumstantial evidence regarding the defect was insufficient to survive a summary judgment motion); Lemons v. Ryder Truck Rental, 906 F. Supp. 328, 332 (E.D. Va. 1995) (holding that plaintiff could escape summary judgment in product liability case where product was no longer available "only if his evidence tends to eliminate all reasonable possibilities that some other party

16

or cause is to blame for the accident, or if the facts are such that no other inference but the existence of a defect in the [product] is reasonable").

In this case, there is evidence suggesting several possible alternate causes of the failure of the cab roller bearing in VNA # 4. As previously noted, an Alliance employee who examined the bearing at the time of the accident indicated that it appeared be "melted," suggesting that the bearing failed due to extended usage. The witness statement of Ralph Buddenhagen, a Hood employee, suggests another possibility. Mr. Buddenhagen drove VNA # 4 two days prior to the subject accident and noted that the VNA may have collided with the end of an aisle. See Alliance's Memorandum in Support of Motion to Exclude Plaintiff's Experts, Exhibit G. During his deposition, Barry Boyer testified that the VNA had been serviced on February 23, 2005 to repair a broken pivot cylinder chain. See Deposition of Barry Boyer at 195-96. Boyer further stated that it would take "considerable pressure" or a large impact to break the chain and that such an impact could have caused the bearing to eventually fail. Id. at 196-98. Therefore, the evidence currently in the record suggests at least three separate possible causes of the failure of the cab roller bearing, including evidence of two separate crashes involving VNA # 4.

The court concludes that, based upon this fact and the fact that the bearing is now unavailable for examination, the plaintiff has not and cannot produce evidence tending either to prove or to negate any of these reasonable explanations for the failure of the bearing. As a result, the plaintiff will not be permitted to present any evidence at trial regarding possible reasons for that failure, and the defendant's dispositive motions will be granted in part. Nevertheless, the parties have all agreed that the cab roller bearing did fail. Regardless of the reasons for that failure, the parties also agree that it caused the cab to become stuck in the raised position, and

17

that the plaintiff was injured after his co-worker operated the manual lowering valve and the cab fell to the warehouse floor. Therefore, the court must consider whether any of the plaintiff's claims may proceed against either defendant given the limitations as stated by the court.

Reynolds' claims against Crown for negligent warning and negligent design address Crown's alleged failure to properly warn of the consequences of opening the manual lowering valve and its failure to provide additional protections for the operator, such as an interface with the VNA's safety system, an alternate method of egress, or a brake system. The court finds that such issues could arise if the cab became stuck for any reason. As a result, with regard to the plaintiff's claims against Crown, the court concludes that the reason for the failure of the cab roller bearing is not relevant to any claim except for (1) his claim that Crown negligently manufactured the VNA so that it malfunctioned and the cab dropped without warning and (2) his claim for a breach of the implied warranty of merchantability. Therefore, the latter claims will be dismissed, but the plaintiff's negligent warning and other negligent design claims may proceed to trial.

Alliance contends that the plaintiff has failed to state a claim with regard to his assertions of negligent maintenance and for negligent training on the use of the VNA's manual lowering valve. With regard to the claim for negligent maintenance and repair, Alliance contends that, because the cab roller bearing is unavailable and the plaintiff is unable to rule out any of the possible causes of the bearing's failure, the plaintiff will be unable to demonstrate that any of Alliance's actions or omissions were the cause of the failure of the bearing. Specifically, Alliance notes that Mr. Buddenhagen indicated that VNA # 4 may have been involved in an accident over the weekend prior to the subject accident. Therefore, Alliance contends it is quite

18

possible that the bearing may have failed solely as a result of this impact, which occurred when

Alliance was not on site and could not have been aware of the collision.

Reynolds responds that there is evidence to indicate that Alliance was informed of some

problems with the VNA prior to the accident. Specifically, Tom Robison of Hood testified at his

deposition as follows:

> A.   I was in the back. I went toward the office. I met Randy coming out of
> the office. It was V4 in lane 1. I then told Randy that I'd spoke to Brian
> [Rudy] two days earlier, and that the cab rollers were worn, and it would
> be okay. He told me it would be okay to operate the VNA.
>
> . . .
>
> Q.   Can you describe the noise in any, any more detail?
>
> A.   I didn't ask Jerod to operate the VNA to hear the noise. We just went to
> Mr. Rudy who was in dry . . . and told him about the noise.
>
> Q.   What did you tell him about the noise?
>
> A.   That the VNA in lane 1, V4, was making a noise. He was aware that the
> cab rollers were worn.

See Deposition of Thomas Allen Robison at 33. Reynolds now contends that Alliance's failure

to take any action to repair the VNA or to take it out of service is the proximate cause of his

injuries, regardless of why the cab roller bearing actually failed, because Alliance was essentially

aware that some accident was imminent.

The court notes that at various points during his deposition testimony, Rudy himself

denied receiving any reports of problems involving noises coming from VNA # 4. In addition,

the statement of Mr. Buddenhagen and the deposition testimony of Mr. Boyer indicate the

possibility of collisions involving the VNA on two separate occasions. If the bearing failed

19

because of an impact, that impact could have been sustained as a result either of the accident that occurred in February 2005 or as a result of the collision that may have occurred during the weekend prior to Reynolds' accident. Even if it is true that Alliance was on notice of some noise coming from VNA # 4 and was aware that the cab rollers were worn, the bearing may not have failed until the collision noted by Mr. Buddenhagen. There is no evidence to indicate that Alliance or any of its representatives were aware of this collision or of the additional noise and smoke coming from VNA # 4 over the weekend prior to the subject accident. Under this scenario, Alliance could not be found liable for negligent maintenance or repair. Without the bearing, however, it is now impossible for the plaintiff to prove or disprove any possible cause of the bearing's failure. Therefore, the court finds that the plaintiff's claim for negligent maintenance and repair against Alliance must be dismissed for lack of proof in accordance with Bolling and Logan, supra.

With regard to Reynolds' claim of negligent training against Alliance, the plaintiff's expert, Frederick Heath, opined that "Alliance failed to properly train Hood personnel in the proper method of manual lowering of the Crown . . . VNA and the dangerous situations that can develop under a slack chain condition." See Alliance's Memorandum in Support of Motion to Exclude Testimony of Plaintiff's Experts, Exhibit M at 7. Alliance contends that Heath testified at his deposition that he had never actually reviewed any of Alliance's training manuals and that he was unaware of the content of any training that either Reynolds or Dove had received prior to the accident. See Deposition of Frederick Heath at 120-24, 195. Furthermore, neither Reynolds nor Randy Dove had participated in the training sessions offered by Alliance in 2000. Therefore,

20

Alliance concludes that there is no evidence to demonstrate that such training could have been a proximate cause of the accident.

As the plaintiff notes, one Hood employee testified during his deposition that he recalls receiving training in 2000 from Alliance regarding the use of the manual control valve, although he does not recall the subject of any other training he may have received on the operation of the VNA. See Deposition of Larry Jackson at 21, 23-24. The record does not indicate whether this employee, Larry Jackson, was specifically asked if he had also been trained on the possible risks of the use of the valve, but he did not volunteer that he had received any such information. Id. at 21. Dove, the individual who used the valve at the time of Reynolds' accident, was not trained by Jackson, however, or by any representative of Alliance. Instead, he was trained in 2001 by his weekend lead, George Narvez, who apparently gave him some instruction on the use of the valve if someone was stuck in the cab of the VNA. See Deposition of Stellman Dove, Jr. at 31-33. There is no evidence in the record, however, to indicate that Narvez had been trained by Jackson, or, in fact, by any Hood employee who had originally been trained by an Alliance representative with regard to the use of the manual lowering valve. Therefore, the court concludes that any connection between the training provided by Alliance in 2000, whatever its content, and that provided by Hood employees to Dove is too tenuous to support a claim for negligent training against Alliance under the circumstances of this case.

Nor is the court persuaded that there remain genuine issues of material fact based upon Heath's opinion that, if Alliance was aware that Hood employees were using the manual lowering valve on the VNA, its representatives should have informed Hood employees of the associated dangers, i.e., the danger of slack chains leading to a possible free fall of the cab. As

21

previously noted, Heath admitted that he has no personal knowledge regarding the content of any training provided by Alliance or Crown or of the training received by Reynolds or Dove and, as a result, cannot speak to whether Alliance did or did not provide such information. Although Alliance's corporate trainer stated that he would have informed an operator not to use the valve if he observed them using it, he also stated that he would say this as a training and "safety guy" and could not speak to what an Alliance mechanic would say. See Deposition of William Wisham at 91-92. The only Alliance employee that may have been aware that Hood employees were using the manual lowering valve was Brian Rudy, just such an Alliance mechanic. See Deposition of Brian Rudy at 213-14.[3] Furthermore, although Alliance may have provided the initial training regarding the operation of the VNA, Hood did not request any additional training sessions on the VNAs from Alliance. The continuing duty to train falls upon the employer, Hood, rather than upon an outside third party. See Sadler v. Lynch, 192 Va. 344, 347 (1951) ("[i]t is the duty of the master to warn the servant of all dangers to which he will be exposed of which the master is or ought to be aware, except as the servant knew or ought to have known about"). Therefore, the court concludes that the plaintiff's claim of negligent training as to Alliance must be dismissed.

---

[3] Specifically, Rudy testified as follows:

| | |
|---|---|
| Q. | During your time at Hood, have you ever seen employees lower the cab by doing the release valve by letting it out a little bit? |
| A. | No, sir. |
| Q. | Never? Have you ever heard an employee talk about doing that? |
| A. | Yes. |
| . . . | |
| Q. | And so you knew from those conversations that one person was doing this and that there wasn't somebody up front watching? |
| A. | I do not know, sir. |
| . . . | |
| Q. | Did you have some understanding that there was one person doing this or two people, or just had no understanding at all? |
| A. | I don't know how many people they had doing it. |

22

## II.    Crown's Motion in Limine to Exclude Testimony of Plaintiff's Experts[4]

Crown has moved to exclude the testimony and opinions of plaintiff's experts, John Orlowski and Frederick Heath.  In his report, Orlowski rendered the following opinions with regard to Crown: (1) the Crown VNA was defective and unreasonably dangerous in that the manual lowering valve bypassed the equipment's safety devices; (2) the Crown VNA was defective and unreasonably dangerous in that Crown failed to provide proper warnings about the hazards of lowering the lift with the operator in the lift; (3) the Crown VNA was defective and unreasonably dangerous in that Crown failed to provide instructions to safely remove an operator from the cab in the event of a malfunction; and (4) the Crown VNA was defective and unreasonably dangerous in that it was not equipped with a mechanical brake that would engage if the chain became slack or the cab began to suddenly drop.  In Heath's report, he opined that Crown negligently designed the VNA because: (1) there is no free fall prevention device applicable to the cab leaf chain support system; (2) there is no interlock between the manual lowering valve and the slack chain sensing system; (3) there is no convenient way for the user of the manual release valve to monitor the amount of slack chain; (4) there are no instructions discussing the potential for slack chain or its consequences; (5) the label adjacent to the manual lowering valve does not contain information about how to measure the amount of slack chain or any instructions for operator escape prior to utilizing the valve; and (6) Crown failed to provide training to Hood employees regarding the cause and consequences of slack chain.

---

[4] Although Alliance has also filed a motion to exclude the testimony of the plaintiff's experts, the court's previously stated rulings dismissing Reynolds' claims for negligent maintenance and repair and negligent training as to Alliance will result in Alliance's dismissal from this case. Therefore, the court will consider only Crown's motion in limine to exclude the testimony of plaintiff's experts as that motion is relevant to the plaintiff's remaining claims against Crown.

Crown contends that under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579

(1993) and Federal Rule of Evidence 702, the testimony of both experts must be excluded.

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge*

and not on belief or speculation, and inferences must be derived using scientific or other valid

methods." <u>Oglesby v. General Motors Corp.</u>, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in

original). Therefore, an expert's opinion may be excluded if "it is based on assumptions which

are speculative and are not supported by the record." <u>Tyger Constr. Co., Inc. v. Pensacola

Constr. Co.</u>, 29 F.3d 137, 142 (4th Cir. 1994).

In determining the reliability of an expert's testimony, "the court has broad latitude to

consider whatever factors bearing on validity that the court finds to be useful; the particular

factors will depend upon the unique circumstances of the expert testimony involved." <u>Westberry

v. Gislaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999). These factors may include "testing,

peer review, evaluation of rates of error, and general acceptability." <u>Oglesby</u>, 190 F.3d at 250.

Nevertheless, the court should be flexible in its evaluation, <u>Id.</u>, and should also "be mindful that

Rule 702 was intended to liberalize the introduction of relevant expert evidence." <u>Westberry</u>,

178 F.3d at 261. As a result, "the court need not determine that the expert testimony a litigant

seeks to offer into evidence is irrefutable or certainly correct." <u>Id.</u> Keeping these principles in

24

mind, the court now turns to its evaluation of the projected testimony of both of the plaintiff's experts in this case as to its claims asserted against Crown.

Crown argues that neither Orlowski nor Heath are sufficiently familiar with the use, operation and specifics of VNAs.[5] Orlowski has admitted that he has never operated a VNA or been a passenger on a VNA. See Deposition of John Orlowski at 38. He also stated that he was not familiar with the companies that manufacture such equipment or with the industry group to which they belong. Id. at 35-36. The court notes, however, that Orlowski has previously worked on a case involving a turret side loader, such as a VNA, and on approximately 25 cases involving other types of forklifts. Id. at 26-27. Furthermore, Orlowski has experience with a broad spectrum of machines and observed another VNA in operation at the Hood warehouse. Id. at 25, 39. Orlowski also inspected VNA # 4 itself, taking photographs and video of the machine, and reviewed the Crown service and parts manual for the VNA. Id. at 30, 40. Therefore, the court concludes that Orlowski is sufficiently familiar with the use, operation and specifics of the VNA involved in this case.

Like Orlowski, Heath has neither operated nor been a passenger on a VNA. See Deposition of Frederick Heath at 38. Unlike Orlowski, Heath admitted that he had not inspected VNA # 4. Id. Nevertheless, Heath has designed numerous lifting products and built automotive lifts for 21 years using lifting technology similar to that used in the VNA. Id. at 16, 26. With regard to the Crown VNA, Heath examined photographs and video taken of the unit, reviewed

---

[5] Crown also argues that neither expert should be permitted to testify regarding their opinions as to the reason for the failure of the missing cab roller bearing on VNA # 4 as neither expert has been able to inspect the bearing. As the court has previously stated, the plaintiff will not be permitted to adduce any evidence, including expert testimony or reports, regarding the possible cause or causes of the bearing's failure.

the operator manual, reviewed Crown engineering drawings of the VNA, reviewed the service and parts manual, and reviewed Orlowski's expert report. See Plaintiff's Memorandum in Opposition to Motion in Limine to Exclude Plaintiff's Expert Witnesses, Attachment 6, Exhibit 64 at 1-2. Given Heath's extensive engineering background, the court concludes that his experience combined with his review of these relevant materials have provided Heath with sufficient familiarity with the operation of VNAs.

Next, Crown asserts that neither Orlowski nor Heath are familiar with the critical facts in this case because they have not met with Reynolds personally or reviewed the entirety of the transcripts of the depositions taken of Reynolds' co-workers. The court finds this argument to be without merit. Both of the plaintiff's experts familiarized themselves with the important facts in this case in that they reviewed excerpts from the plaintiff's and his co-workers' deposition transcripts as well as the reports of the accident and photographs taken of VNA # 4. Furthermore, given that the court has dismissed the plaintiff's claims of negligent maintenance against Alliance, the testimony of other Hood employees regarding problems with VNA # 4 is no longer relevant to the remaining claims in this case.

Crown also argues that Orlowski's proposed testimony regarding the negligent design of the VNA is too speculative in that he failed to perform any testing of his alternate design or of the VNA itself, did not tether his opinion to any industry standards, and failed to rely upon literature, treatises, or trade publications, instead relying upon his years of experience with machine design. Crown cites Alevromagiros v. Hechinger Co., 993 F.2d 417 (4th Cir. 1993) in support of these contentions. In Alevromagiros, the plaintiff had been injured as a result of the failure of the ladder he was climbing. The Court noted that "[i]n determining what constitutes an

unreasonably dangerous defect, a court will consider safety standards promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers." 993 F.2d at 420. The expert hired by the plaintiff, however, had failed to perform any tests of identical but undamaged ladders to determine whether the subject ladder conformed to industry standards, testified to no customs of the trade, referred to no literature, and did not identify any reasonable expectations of consumers. Id. at 421. The Court permitted the expert to testify, but granted a directed verdict for the defendant after it found that the expert's testimony reflected merely his own subjective opinions. Id.

Orlowski admitted that he did not rely upon any industry standards or particular treatises or trade publications in forming his opinions, although he stated that he had reviewed the ANSI standard regarding the general requirement for a manual release valve. See Deposition of John Orlowski at 52, 80-81, 86-87. Instead, Orlowski primarily formulated his opinions with regard to the alleged design deficiencies based upon his extensive experience as a forensic engineer dealing with machine cases and upon his general review of industry literature over a 20 year period. Id. at 25, 65. With regard to his recommendation for a brake on the VNA, Orlowski also made reference to an ANSI standard which alludes to the need for a brake or other device to minimize the speed at which a lift would drop in the event of a broken hydraulic or other problem. Id. at 101.

Orlowski further stated that he believed no testing of his alternate designs was needed because he had seen these designs on "many other machines." Id. at 54-55. When alternate designs are already commercially available, an expert need not be required to actually build and test his proposed alternate design. See Simo v. Mitsubishi Motors North America, Inc., 245 Fed.

27

Appx. 295, 300 (4th Cir. 2007). Instead, an expert's failure to specifically test his theories may go to the weight of his testimony rather than to its admissibility. Clay v. Ford Motor Co., 215 F.3d 663, 668 (6th Cir. 2000).

The court finds that Orlowski's testimony is sufficiently reliable with regard to his opinions related to the plaintiff's negligent design claims. Although Orlowski may not have relied specifically upon industry standards, he has demonstrated familiarity with those standards and did review particular, relevant standards, as well as industry literature, in the course of formulating his opinions, unlike the expert in Alevromagiros, supra. Orlowski's experience as an engineer is extensive, and he did rely upon certain safety features of other, similar machines which are available on the market. The court agrees that his testimony will be subject to vigorous cross-examination during which Crown will be entitled to point to the issues identified by the defendant which would go to the weight of his testimony, such as his failure to rely upon a particular standard and his failure to test his alternate designs on an actual VNA. The jury may find that his opinions are entitled to less weight as a result of these deficiencies. Nevertheless, the court determines that Orlowski's opinions and methodology are sufficiently reliable to be presented to the jury at trial.

Crown makes similar arguments with regard to Heath's opinions regarding the alleged negligent design. Specifically, Crown contends that Heath has failed to acquaint himself with the VNA, has not spoken with the plaintiff, did not review complete depositions of co-workers, and failed to rule out alternate causes of the accident. With regard to the latter two issues, the court finds Crown's argument moot as this evidence would primarily go to the reasons for the failure of the cab roller bearing, and the court has previously held that no testimony would be permitted

28

on this issue at trial. Furthermore, the court has previously held that Heath has sufficiently familiarized himself with the VNA in that he examined photos and video of the VNA, reviewed Crown manuals and engineering drawings of the VNA, and reviewed the reports of other engineering experts. Heath also reviewed industry standards relating to lifting equipment and free fall prevention devices. See Deposition of Frederick Heath at 41, 51. Heath stated, like Orlowski, that he has seen the alternate designs he suggests on other lifting machines such as elevators and automotive lifts. Id. at 56-58, 60. Heath has also tested free fall prevention devices in other applications in the automotive lift industry. Id. at 80. Of course, the defendant is free to highlight the differences between such machines and the VNA at issue in this case on cross-examination. Nevertheless, the court finds that Heath's opinions are based on a sufficiently reliable methodology to be admissible at trial.

Crown next argues that neither Orlowski nor Heath should be permitted to testify regarding the plaintiff's claim of negligent warning because they have never received any training on warnings or ergonomics and they do not have degrees with an emphasis on human factors. As the plaintiff notes, however, Orlowski stated that he has written articles containing sections on warnings, has designed warnings for machine products, has reviewed industry literature related to warnings, and is a member of at least two safety societies which publish articles on warnings. See Deposition of John Orlowski at 57, 59-60, 65. Likewise, Heath has been involved in the development of warnings, is familiar with American National Standards regarding the development of warnings, and has written articles discussing warnings. See Deposition of Frederick Heath at 93-94, 96. Therefore, the court concludes that both Heath and Orlowski are qualified to discuss issues regarding appropriate warnings on machine equipment

29

based upon their experience in the industry, notwithstanding their lack of formal training on the subject. Of course, once again, Crown is free to point out during cross-examination that the warnings previously designed by Heath and Orlowski were for machines other than a VNA. Nevertheless, the court finds that this evidence goes to the weight of the experts' opinions rather than to their admissibility.

Finally, Crown maintains that Heath's opinion on Crown's alleged failure to provide training to Hood employees is not sufficiently grounded in fact because it is based upon his experiences in various industries rather than that involved in this specific case or on the training actually provided to Reynolds and Dove by Crown. The court is constrained to agree. It is undisputed that Alliance, not Crown, provided the initial training to Hood employees when the VNA was purchased in 2000. It is also undisputed that Reynolds was not trained by any representative of either Alliance or Crown. Reynolds admitted at his deposition that he did not recall seeing any written materials, such as an operator's manual, regarding the operation of the VNA. See Deposition of Ray Reynolds at 58, 170-71. Heath admitted that he was not aware of what specific training either Reynolds or Dove actually received on the VNA and that he had not seen any Crown training materials for the VNA. See Deposition of Frederick Heath at 121, 123. Therefore, the court concludes that Heath's opinion regarding Crown's alleged failure to provide adequate training is purely speculative and cannot be admitted at trial.

## CONCLUSION

For the reasons set forth above, the court will grant defendant Alliance's motion for summary judgment for failure to state a claim with regard to the plaintiff's allegations of negligent maintenance and repair and negligent training. Because this ruling will result in

Alliance's dismissal from this case, its motion to exclude the testimony of plaintiff's experts will be denied as moot. Defendant Crown's motion to dismiss will be granted with regard to the plaintiff's claim of negligent manufacture and breach of the implied warranty of merchantability, however the motion will be denied as to the plaintiff's remaining claims for negligent design and negligent warning. Furthermore, Crown's motion to exclude the testimony of plaintiff's experts will be granted only with regard to Heath's opinions regarding negligent training. In all other respects, the motion will be denied.

The Clerk of Court is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 16th day of June, 2008.

_____
United States District Judge

31